IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NORMAN RAY FRANCIS, JR., )
)
Plaintiff, )
) Civil Action No. 1:23-cv-2175-LKG
v. )
) Dated: August 2, 2024
RICHARD WEBER, Warden, )
JEANNETTE CLARK, NP, )
MASOUD DJAHANMIR, )
DR. SUSAN ARNOULT,[1] )
)
Defendants. )

## MEMORANDUM OPINION

Self-represented plaintiff Norman Ray Francis, Jr., a state inmate currently confined at Patuxent Institution ("Patuxent"), filed this amended civil rights complaint pursuant to 42 U.S.C. § 1983, against Warden Richard Weber, and medical providers, Jeanette Clark, NP, Masoud Djahanmir, and Susan Arnoult (the "Medical Defendants"). ECF No. 4. Francis seeks monetary damages and injunctive relief regarding the denial of medical care while he was housed at Western Correctional Institution ("WCI"). *Id.*

In response to the amended complaint, Defendants filed motions to dismiss or, in the alternative, for summary judgment. ECF Nos. 19 and 21. Francis was advised of his right to file opposition responses to Defendants' motions and of the consequences for failing to do so. ECF Nos. 20 and 22. Francis responded (ECF No. 23) and the Medical Defendants replied (ECF No. 27). The Court has reviewed the pleadings and finds a hearing unnecessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons stated below, Defendants' motions shall be **GRANTED**.

### I.   Background

#### A.   Plaintiff's Allegations

Francis claims that in November of 2022, he began to experience neck pain, aching joints, difficulty breathing and swallowing, and had a lump in his throat. ECF No. 4 at 4. A

---

[1] The Clerk shall amend the docket to reflect the correct spelling of Defendants' names as indicated in this caption.

nurse examined him, stating that he may have strep throat, and gave him Claritin D. *Id.* In December of 2022, Francis was examined by Dr. Djahanmir, who ordered blood tests and a spinal x-ray and diagnosed Francis as suffering from a sinus infection and prescribed antibiotics. *Id.* Francis's symptoms did not improve and Dr. Djahanmir ordered additional labs as well as x-rays of Francis's chest and neck. *Id.* at 4-5. Francis was seen by Dr. Djahanmir several more times and was then referred to Dr. Arnoult, who examined Francis's neck and ears. *Id.* at 5. Dr. Arnoult told Francis that he might have thyroid problems and ordered additional labs. *Id.* After the tests were completed, Francis was evaluated by Nurse Practitioner (NP) Clark who ordered additional labs including a stool sample and diagnosed him with Helicobacter pylori ("H. pylori") and stomach ulcers. She prescribed medication to treat these issues. *Id.* Francis explains that he continued to complain of a lump in his throat, joint aches, and neck pain, but Clark advised that those were symptoms of his stomach issues. *Id.* Francis continued to suffer the same symptoms and Clark ordered x-rays of his throat, which showed swelling. *Id.* Francis states that Clark also ordered a CT scan and referred him to see an ear, nose, and throat ("ENT") specialist. He asserts that Warden Weber denied the CT scan. *Id.* at 6. Francis claims that he has complained of throat and neck pain since November 2022, and Dr. Arnoult advised him that the medical department does not have the technology to see down the throat. *Id.* Francis claims that Dr. Arnoult, Dr. Djahanmir, and Clark all stated his symptoms were related to a sinus infection, strep throat, and stomach infection to deliberately delay his evaluation by a specialist. *Id.*

In his response in opposition, Francis contends that after he submitted three sick call slips regarding the same complaint, he should have been referred to an onsite provider, but he submitted over 15 sick call slips, attended three unscheduled visits, and was seen by three different providers, who each diagnosed him with a different issue. ECF No. 23 at 1. Francis contends that he never tested positive for a sinus infection or strep throat and was misdiagnosed with those issues, further delaying his evaluation, in an attempt to save money. *Id.*

Additionally, Francis states that he was scheduled for a biopsy on February 20, 2024, but the biopsy had to be postponed because the medical department failed to tell him not to eat or drink for 24 hours. *Id.*

Francis also contends that Warden Weber "is responsible for the denial of the C-Scan and soft tissue evaluation because he signed the denial of the A.R.P. Administrative Remidial [sic]

Process which [Francis] filed due to the lengthy time delay between sick and provider scheduling." *Id.*

Francis states that Dr. Djanhanmir ordered x-rays of his lower back which showed mild degenerative joint disease, but it was not treated. Dr. Djanhanmir also diagnosed Francis as suffering from low vitamin D levels, but Francis was not prescribed vitamin D or muscle rub until February 2, 2024, after he was transferred to Patuxent. *Id.*

Francis states that, as of the date of his filing his response in opposition, he continues to suffer pain and difficulty swallowing and breathing. *Id.* He asks that the Court delay its finding until he receives the biopsy and endoscopic procedures which were to be rescheduled.[2] *Id.* He asserts that his medical records "show a high level of unprofessionalism, lack of concern, as well as a deliberate attempt to delay treatment . . . ." *Id.* at 2.

### B. Medical Defendants

In response to Francis's complaints of back, neck, and shoulder pain, a nurse evaluated him on November 3, 2022, in sick call at WCI. ECF No. 21-6 at 14. "[E]verything seeme[ed] to be normal" upon examination. *Id.* at 15. Francis was able to turn and bend his head and neck and move his extremities well. *Id.* Francis was given Naproxen and referred to a provider. *Id.*

A few days later, a nurse received a call from Francis's housing unit advising that he complained of chest pains. *Id.* at 13. Francis walked into the dispensary "with a limping gait and state[d] his 'back and chest crack when he tries to do anything and [he] is in a lot of pain.'" *Id.* Francis reported that he worked out every day but believed something was wrong with his body. He was able to perform all range of motion movements without any restrictions. No neurological deficits were observed and his lungs were clear. Francis was educated on exercise-induced body aches. He was encouraged to reduce his level of exercising, increase water intake, and refer any further issues to the medical department. *Id.*

On November 18, 2022, a nurse received a call from Francis's housing unit that he complained of chest pain. *Id.* at 11. He was brought to the infirmary in a wheelchair and complained of pain, stiffness, and numbness to his upper right chest and shoulder. He stated he could hear clicking when turning his neck. *Id.* at 10. He requested bloodwork and an x-ray. An

---

[2] Francis's request to delay resolution of this case is denied. None of the named Defendants are employed at Patuxent institution where Francis is currently incarcerated and therefore, they are no longer responsible for his medical care. If Francis believes he is not receiving constitutionally adequate medical care at Patuxent, he may file a new civil rights complaint detailing those claims and naming appropriate Defendants.

ECG showed normal sinus rhythm and he denied recent exercise or injury. *Id*. at 11. His heart rate was regular and his lungs clear with respirations even and unlabored. Francis's history of substance abuse was noted and that he was potentially drug seeking. *Id*. He was warned about the dangers of drug use and encouraged to place a sick call if symptoms continued. *Id*.

On November 30, 2022, a nurse evaluated Francis in sick call. *Id*. at 7. Francis stated he needed a blood test because something was wrong with his body. *Id*. Francis reported that his neck pain was getting worse and spread throughout his body. He complained of aching joints and stated that he could hear bones grinding in his neck. *Id*. Francis also reported that it was difficult for him to get out of bed and when he did, he could "hear [his] neck and chest crunching." *Id*. at 8. A referral was placed for Francis to be seen by a provider. *Id*.

On December 1, 2022, Francis was evaluated by a nurse in the infirmary due to his reporting that he vomited blood. *Id*. at 5. Francis stated that he vomited blood twice, his left side felt numb, and he felt dizzy. *Id*. He did not appear in any distress and his vital signs were stable. He was advised to vomit into a receptacle if it happened again so that the vomit could be assessed. *Id*. at 6. It was noted that he was seen the day before and was already referred to a provider. *Id*.

On December 5, 2022, Dr. Masoud Djahanmir evaluated Francis due to his complaints of vomiting blood and back pain. *Id*. at 1. Francis reported vomiting what appeared to be blood on one occasion. He did not have any other GI complaints but stated that on occasion he felt short of breath. *Id*. Francis also reported a history of lower back pain. The lower back pain did not radiate and there was no history of injury. *Id*. Francis also had a new complaint of multiple joint pain with crepitus as well as neck pain with bilateral hand numbness and tingling. *Id*. Dr. Djahanmir planned to obtain x-rays of Francis's lumbar and cervical spine. He advised Francis not to lift items heavier than five pounds and ordered blood work. *Id*. at 3.

On December 15, 2022, a nurse saw Francis in sick call because he reported that he could not swallow without his throat clicking and he was experiencing unbearable neck pain. ECF No. 21-5 at 32. Francis was referred to a provider. *Id*. at 33. Two days later, another nurse saw Francis in sick call due to his complaints that he felt like he had "bubbles in [his] throat" and could not swallow. *Id*. at 29. Sinus drainage to the back of the throat with pink color was noted. The nurse determined that Francis was at risk for a sinus infection, gave him a dose of Claritin,

4

ordered no work/play for five days, and educated him to gargle with salt water twice per day. *Id.* at 30-31.

On January 2, 2023, a nurse examined Francis in sick call due to his complaints that he had a sinus infection and needed antibiotics. *Id.* at 27. However, at the visit, Francis reported the sinus infection had resolved. Francis also stated that he had x-rays in December but was not told of the results and his back and neck issues continued. *Id.* at 28. The nurse noted that Francis would be scheduled with a provider for follow-up as to results of the x-ray. *Id.*

On January 4, 2023, Dr. Djahanmir evaluated Francis after he was referred by a nurse due to his complaints of sore throat and pain in the anterior aspect of the neck and pain and stiffness in multiple joints. *Id.* at 22. Dr. Djahanmir assessed acute pharyngitis and prescribed the antibiotic azithromycin for four days, along with Prilosec OTC, and Tylenol. *Id.* at 24.

A nurse evaluated Francis on January 12, 2023, in sick call. *Id.* at 18. Francis explained that he was still having issues with a sore throat and felt like it was swelling. On examination, postnasal drip and swollen tonsils/lymph nodes were observed. The nurse educated Francis that he was probably suffering from allergies, and he agreed to a trial of allergy medication. He was also referred to a provider. *Id.*

Dr. Djahanmir met with Francis on January 17, 2023, to review his blood work. *Id.* at 14. Dr. Djahanmir noted Francis's history of hyperlipidemia, gastroesophageal reflux disease ("GERD"), rhinitis, and obesity and noted that Francis complained of feeling something stuck in his throat. *Id.* He also noted that Francis had previously been treated for a sore throat. Francis complained of heartburn and burping, and Dr. Djahanmir determined Francis suffered from GERD without esophagitis and increased his dose of Prilosec and ordered labs to check for an H. pylori infection. *Id.* at 16. Dr. Djahanmir noted that Francis's complaints of throat pain could be due to GERD. *Id.* Dr. Djahanmir prescribed Lipitor to treat Francis's high cholesterol. *Id.*

On February 22, 2023, Francis was seen by a nurse for an itching rash of unknown origin. ECF *Id.* at 7-8. The nurse referred Francis to Dr. Djahanmir who evaluated Francis and prescribed prednisone to treat the rash and directed Francis return for follow up. *Id.*

On March 6, 2023, a nurse evaluated Francis in sick call for complaints of a lump in his throat, difficulty swallowing and breathing, neck pain, and joint aches. *Id.* at 4. Francis reported that he had a lump in his throat that made it hard to swallow and breathe and his neck was sore on the left side. He also stated that when he moved his neck, he heard a crunchy sound that

moved to his chest. He reported that he had been suffering these symptoms for two months and also suffered from body aches. *Id.* Francis was directed to gargle with warm salty water and offered Tylenol for pain, which he declined. He was referred to a provider. *Id.*

Dr. Djahanmir evaluated Francis on March 24, 2023. *Id.* at 1. Francis repeated his complaints of a lump in his throat and nonspecific arthritis pain with his bones making a crackling noise. *Id.* He also complained of popping in his ears and shortness of breath (dyspnea) but no cough. *Id.* Dr. Djahanmir assessed psychogenic dysphagia including globus hystericus (a swallowing disorder with no structural or organic cause). *Id.* at 3; ECF No. 21-2 at 7, ¶ 20. He planned to order a chest x-ray. ECF No. 21-5 at 3. It was further noted that Francis had a Vitamin D deficiency, and Dr. Djahanmir prescribed Vitamin D2. *Id.* at 3. As to Francis's complaints of joint pain, Dr. Djahanmir ordered antinuclear antibody (ANA)/ C-reactive protein, and serum (CRP) / ESR (SED-rate) labs. *Id.*

On April 17, 2023, Dr. Susan Arnoult evaluated Francis for chronic care/sick call. ECF No. 21-4 at 30. Dr. Arnoult noted Francis reported painful swallowing and globus sensation in his throat over the last seven months which seemed to be worsening and he also complained of joint aches. *Id.* She noted that blood work was recently drawn and "the ANA was just barely positive" but no recent thyroid tests had been done. *Id.* Francis reported that he had GERD in the past and was treated for it, but he did not believe it helped. He also described recent voice changes and that he could not lay on his back because of the sensation of choking. He denied allergy or sinus symptoms and explained that treatments for both were tried for the symptoms associated with his throat but did not alleviate the problem. Francis also stated that he did not feel anxious and had never been treated for anxiety disorder. *Id.* Dr. Arnoult assessed Francis's change in voice and throat complaints as possibly: "(1) Vocal cord lesion-cancer or a benign polyp (2) Inflammation from inadequate GERD treatment and LPR[3] (3) Neuro cause (unlikely)." *Id.* at 31. As to Francis's joint pain, Dr. Arnoult's differential diagnosis included a rheumatologic condition or an early inflammatory process. *Id.* She ordered several labs, restarted a different proton-pump inhibitor ("PPI") for his GERD, and planned to refer him to an ENT for a scope to check his vocal cords which Dr. Arnoult was unable to visualize. ECF No. 21-2 at 8, ¶ 21. As to

---

[3] Laryngopharyngeal reflux, a condition where a muscle at the end of the esophagus does not close properly and allows the stomach contents to reflux back into the esophagus and cause irritation. ECF No. 21-2 at 7-8, ¶ 21.

the dysphagia, Dr. Arnoult's differential diagnosis included LPR, a foreign body/polyp, and globus/anxiety. She ordered the PPI Protonix 40 mg for 120 days. *Id.*; ECF No. 21-4 at 30, 33.

On May 6, 2023, a nurse evaluated Francis during an unscheduled sick call after his housing unit called and stated he was complaining of difficulty breathing. ECF No. 21-4 at 27. Francis walked into the medical room with a steady gait and was not in apparent distress explaining that his throat hurt when he swallowed, and the pain went into his neck. He also stated that he felt "weird when he breathes when he lays down." He explained that the issue had been going on for a while and he had previously been treated for allergies. Examination revealed that his throat was red and irritated, with two small white spots on the back of the throat which appeared to be strep. *Id.* at 28. NP Clark was contacted and issued an order to immediately give Francis an antibiotic. *Id.* at 26, 28.

Clark also ordered a H. pylori stool antigen. *Id.* at 26. An H. pylori infection occurs when the H. pylori bacteria infect the stomach. ECF No. 21-2 at 8-9, ¶ 23. This bacterium commonly causes stomach ulcers. Symptoms of the infection can include burning or aching in the stomach, stomach pains that are worse on an empty stomach, nausea, the loss of appetite, burping, bloating, and/or unintentional weight loss. H. pylori infections are treated by prescribing two antibiotics along with PPIs to stop acid production. *Id.* On May 16, 2023, Clark noted that Francis's stool antigen test was positive for H. pylori. ECF No. 21-4 at 23-24. Clark notified Francis of the positive test and his need to take Clarithromycin, Amoxicillin, Metronidazole, and Omeprazole for 14 days to clear the infection and advised that he would be retested in six weeks. *Id.* at 22.

On May 31, 2023, a nurse evaluated Francis in sick call due to his complaints that he remained ill even after completing the H. pylori treatment. *Id.* at 20. Francis appeared to be in pain when he tried to raise his arms above his head and his throat was red and irritated. *Id.* Francis reported that his throat remained sore and felt as though things "get stuck" when he tries to swallow. He described neck pain when lifting his arms or turning his head. He was referred him to a provider. *Id.*

On June 2, 2023, Francis was again seen in sick call and stated that he needed to see a doctor. *Id.* at 18. He explained that he recently finished treatment for H. pylori and had joint pain. His physical exam was unremarkable, and it was noted that a provider referral was already placed. *Id.*

On July 7, 2023, NP Clark saw Francis to follow-up on his H. pylori treatment and other concerns. *Id*. at 10. Clark advised Francis that his repeat stool antigen test was negative, and he had cleared the infection. Francis reported feeling/hearing crackling of bones in his neck with extension and flexion and believed it was spreading. He reportedly could feel the sensation in his shoulders and elbow. He had full range of motion in his neck. Francis also reported that he continued to feel a lump in his throat when he swallowed. He explained that when he turned his head, he could feel something shift, causing pressure. He also stated that he could not lay on his back without feeling like he was choking. He asked how he could be checked for throat cancer. *Id*. Clark reviewed Francis's medical records and noted his history regarding his throat complaints, specifically that since January 2023 he had been seen by a variety of medical staff on 13 occasions. He had previously been ordered an oral steroid taper for severe allergies and tried Zyrtec without improvement. He also was prescribed PPI before the H. pylori diagnosis and treatment. Francis's weight had not varied over the past two years. Francis's thyroid tests were all normal, as was his comprehensive metabolic panel ("CMP"), other than a slightly elevated LD and creatinine, which had improved from previous testing. Additionally, Francis's chest x-ray from March of 2023 did not show any acute cardiopulmonary disease. Clark ordered cervical spine and neck soft tissue x-rays along with an ACE level. She noted that, after this testing, all the testing that could be performed onsite would be exhausted and she would discuss the next plan with the Regional Medical Director ("RMD") the following week. *Id*.

The following day, Clark wrote an administrative note that Francis was scheduled for sick call that afternoon, but his concerns had been addressed the prior day. *Id*. at 9. However, when Francis came to sick call, he brought a pair of boxer shorts in a paper bag to show her and stated that blood was running out of his rectum and penis the previous evening. Clark noted that his white boxer shorts had a red/brown substance smeared on them. *Id*. Francis's hemoglobin and hematocrit levels were stable in April 2023; Clark nevertheless added a CBC test to the ACE level she ordered the day before. *Id*.

On July 14, 2023, x-rays of Francis's neck were taken. ECF No. 21-7 at 19-20. The x-rays showed mild ventral soft tissue thickening in the supraglottic region somewhat effacing the airway. The radiologist recommended further assessment by a contrasted CT. *Id*. at 19.

On July 18, 2023, Clark submitted a consultation request for a CT scan with contrast of the soft tissue of the neck. ECF No. 21-4 at 5. On July 20, 2023, Utilization Management

("UM") returned an Alternative Treatment Plan ("ATP") denying the request and recommending an ENT consultation. *Id*. at 7. Clark explains that Warden Weber had no role in Francis's medical care and was not involved in the UM process and did not deny the CT scan. ECF No. 21-2 at 11, ¶ 30.

On July 28, 2023, Clark submitted a consultation request for an ENT to evaluate dysphagia and the abnormal neck x-ray, which was approved. ECF No. 21-4 at 2-4.

A nurse evaluated Francis in sick call on August 20, 2023. *Id*. at 36. Francis reported that his throat felt worse. *Id*. The nurse noted Francis's history of this complaint, that he continued to be worked up, and was scheduled to see an ENT the following month. *Id*. at 27. Francis explained that "sometimes it just freaks him out and his anxiety gets the best of him." *Id*. He was reassured that he was being taken care of and he calmed down. *Id*.

On September 5, 2023, Dr. Simon Roderick Alfred Best, an otolaryngologist a Johns Hopkins, evaluated Francis. ECF No. 21-7 at 24-28. Dr. Best recounted Francis's relevant medical history including that the symptoms of dysphagia began about one year ago and his prior diagnosis of H. pylori which was treated with antibiotics which did not improve the dysphagia symptoms. *Id*. at 24-25. Imaging was obtained. *Id*. at 25. It was further noted that Francis had been treated with omeprazole for heartburn which resolved the heartburn symptoms. Francis explained that he felt as if he was choking in the central area of his neck. *Id*. He also reported a popping sound when he laid down at night and felt a strain and discomfort when he attempted to rise from a laying position. *Id*. Dr. Best assessed Francis as possibly suffering from eosinophilic esophagitis ("EoE") and noted that the swallowing issues and throat pain were consistent with EoE, particularly in light of Francis's history of hives and nasal allergies. *Id*. at 25-26. Dr. Best recommended an esophagogastroduodenoscopy ("EGD") for a biopsy of the mid-esophagus and discussed treatment options with Francis, which included dietary changes and oral steroids. Specifically, Dr. Best explained that they could try a reduction of wheat in the diet, which was the most likely trigger for EoE. *Id*.

Clark explains that EoE is a chronic immune system disease. ECF No. 21-2 at 13, ¶ 33. With EoE, eosinophils, white blood cells, build up in the lining of the esophagus. The buildup is a reaction to foods, allergens, or acid reflux and can inflame or injure the esophageal tissue. Damaged esophageal tissue can lead to difficulty swallowing or can cause food to get stuck in the esophagus when swallowing. *Id*.

On September 7, 2023, Francis was transferred from WCI to Patuxent Institution. After his transfer, Clark had no further direct involvement with his care. *Id.* at 13, ¶ 34. Clark specifically denies ever delaying or denying treatment to Francis. ECF No. 21-1 at 2, ¶ 5.

On September 10, 2023, Clark entered an Administrative Note in Francis's medical records reflecting that he was transferred to Patuxent and the notes from the ENT would need to be reviewed and followed-up with by providers at his new facility. ECF No. 21-3 at 31.

A nurse practitioner at Patuxent submitted a consultation request, on October 2, 2023, for an urgent GI evaluation and treatment. *Id.* at 24-25. The request noted the prior ENT evaluation and assessment of possible EoE with plan to proceed to an EGD for biopsy of the mid-esophagus and treatment. *Id.* UM approved the request for a GI telemedicine evaluation on October 6, 2023. *Id.* at 26. As of the filing of Medical Defendants' dispositive motion, both the GI telemedicine visit and the EGD were scheduled, but due to security reasons, Francis was not permitted to know the exact dates of the appointments. ECF No. 21-2 at 13, ¶ 36.

### C. Warden Weber

Warden Weber avers that medical services are provided to incarcerated individuals at WCI by a private medical contractor. ECF No. 19-3 at 1, ¶ 2. He has no personal involvement in providing medical care to any inmate and has no authority to make decisions regarding an inmate's medical care. *Id.* Additionally, he has no authority to direct a particular medical procedure or treatment. *Id.* Warden Weber defers to the expertise of medical staff regarding the treatment of inmates at WCI. *Id.* at ¶ 3. When an inmate seeks medical care, they may fill out a medical slip which is reviewed by medical staff who then determine appointment dates and times. *Id.* at ¶ 4. When an inmate complains about medical care, Warden Weber relies on the reports, assessments, and judgments of the medical staff in responding to the complaint. *Id.* at ¶ 5. He specifically denies taking any part in the provision of medical care to Francis or in any decision regarding his care or that he "interfered with, hindered or delayed medical treatment or care to Mr. Francis . . . ." *Id.* at ¶ 6.

### II.   Standard of Review

In reviewing the amended complaint in light of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs.,*

*Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States has explained that a "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

While self-represented pleadings are liberally construed, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), this Court maintains an "affirmative obligation . . . to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

### III. Analysis

Personal participation

Francis alleges that Warden Weber dismissed his grievance. It is well settled that liability under Section 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Mere review of inmate grievances is insufficient to state a claim because, in short, the denial of a grievance does not alone give rise to liability. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (noting the allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009)); *Whitington*, 307 F. App'x at 193 ("[D]enial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.")

To the extent Francis seeks to hold Warden Weber liable solely because of his supervisory role, those claims also cannot proceed. The doctrine of *respondeat superior* does not apply in Section 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (disclaiming respondeat superior liability under § 1983).[4] Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"

---

[4] *Respondeat superior* is a legal doctrine that provides an employer is liable in certain instances for the wrongful acts of an employee. *See Black's Law Dictionary* (8th ed. 2004).

12

*Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Ultimately, to establish supervisory liability under Section 1983, the plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). At this early stage of litigation, the plaintiff must allege facts that, if proven, would establish such liability. Francis has failed to plead such facts as he points to no action (or inaction) on the part of Warden Weber that resulted in a constitutional injury. As such, Defendant Warden Weber is entitled to dismissal.

Injunctive Relief

To the extent Francis also seeks injunctive relief, his request is denied. A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Failure to establish one of these elements is fatal to the request for injunctive relief. For the reasons discussed below, Francis has failed to demonstrate the likelihood of success on the merits. Therefore, his request for injunctive relief must be denied.

Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must

13

demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–38 (1994); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see, e.g., Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of

a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Assuming that Francis has established that he suffers from a serious medical need, the record evidence demonstrates that Warden Weber was not responsible for the day-to-day provision of medical care and the record does not support the claim that he was deliberately indifferent to Francis's medical needs. The record evidence further demonstrates that none of the named Medical Defendants were deliberately indifferent to Francis's medical needs.

The record demonstrates that Francis had a sinus infection, strep throat and an H. pylori infection and that each of these issues were treated in turn by the named medical providers in a sincere effort to treat his symptoms and establish the cause of his complaints. That none of these treatments resolved Francis's underlying problem does not establish that any of the Medical Defendants were deliberately indifferent to his medical needs. Instead, Francis's medical records demonstrate that the Medical Defendants endeavored to get to the root of his complaints by examining him, providing medication, and ordering diagnostic testing including blood work, stool antigen testing, and x-rays. Ultimately, Francis was referred to a specialist who requested further diagnostic testing which was scheduled. There is simply no evidence that any of the Medical Defendants intentionally delayed Francis's treatment or referral to a specialist for further diagnosis. Nor is there any evidence that the named Medical Defendants knew of and disregarded an excessive risk to Francis's health or safety. While the Court is mindful of Francis's stated pain and anxiety regarding his throat condition, the record demonstrates that the Medical Defendants acted reasonably to diagnose and treat his disorder. That they erroneously believed his concomitant ailments (sinus infection, allergies, strep throat, H. pylori) were the source of his problems does not demonstrate deliberate indifference. And so, Medical Defendants are each entitled to summary judgment.

### IV.    Conclusion

By separate Order which follows, Defendants' motions to dismiss or, in the alternative, for summary judgment shall be **GRANTED**.

August 2, 2024
Date

LYDIA KAY GRIGGSBY
United States District Judge

15